**IN RE: Scott C. GESUALDI, Debtor.**

**Scott C. Gesualdi, Plaintiff**

**v.**

**Educational Credit Management Corporation, Defendant.**

**CASE NO.: 07–12637–BKC–PGH**

**ADV. NO.: 12–01816–BKC–PGH–A**

United States Bankruptcy Court, S.D. Florida.

**West Palm Beach Division**

Filed 08/06/2013

---

John D. Eaton, Shawde & Eaton, P.L., Weston, FL, for ECMC, Defendant.

Gary J. Lublin, Orlando, FL, for Sallie Mae Inc., Defendant.

## CHAPTER 7

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Paul G. Hyman, Chief Judge, United States Bankruptcy Court

**THIS MATTER** came before the Court for trial on May 28, 2013, upon Scott C. Gesualdi's (the "Plaintiff") *Amended Complaint to Determine Dischargeability of Debt Pursuant to § 523(a)(8)* (the "Amended Complaint") (ECF No. 39) against Educational Credit Management Corporation, commonly known as ECMC (the "Defendant"). On December 6, 2012, the Defendant filed its *Answer to Amended Complaint* (the "Defendant's Answer") (ECF No. 45). On April 25, 2013, the Plaintiff and the Defendant filed a *Stipulation of Certain Facts* ("Joint Stipulation") (ECF No. 64).[1]

### *FINDINGS OF FACT*

#### I. Stipulated Facts

On April 13, 2007, the Plaintiff filed a voluntary chapter 7 petition for bankruptcy relief. The Plaintiff is a 46–year–old married man with one minor child born on November 25, 2008. J. Stip. at ¶ 3. The Plaintiff commenced the instant adversary proceeding on August 12, 2012, by filing a *Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(8)* (ECF No. 1) against Sallie Mae, Inc. *Id.* at

---

1. On June 13, 2013, following trial, the Plaintiff submitted his *Proposed Findings of Fact* (ECF No. 45) (the "Plaintiffs Proposed Findings of Fact"). On June 14, 2013, the Defendant submitted its *(Proposed) Findings of Fact and Conclusions of Law* (the "Defendant's Proposed Findings of Fact") by email to the Court and to the Plaintiff.

¶ 4. On November, 12, 2012, the Defendant filed its *Motion to Join Educational Credit Management Corporation as Party Defendant Due to Transfer of Interest, and to Dismiss Sallie Mae, Inc.* (the "Motion to Join") (ECF No. 32). *Id.* at ¶ 5. On December 4, 2012, the Plaintiff filed his Amended Complaint to name ECMC as a defendant. *Id.* at ¶ 6. On December 6, 2012, the Court entered the *Order on Motion to Join Educational Credit Management Corporation as Party Defendant Due to Transfer of Interest, and to Dismiss Sallie Mae, Inc.* (ECF No. 43). *Id.* at ¶ 7. The Plaintiff's Amended Complaint, filed against the Defendant after the Defendant replaced Sallie Mae, Inc. as the proper party, asserts undue hardship and seeks an order discharging the student loan debt now owed to the Defendant.

The debt at issue in this adversary proceeding is a student loan (the "FFELP Loan") made pursuant to the Federal Family Educational Loan Program ("FFELP") and currently held by the Defendant. *Id.* at ¶ 8.[2] The FFELP Loan was used to consolidate and pay off ten separate loans that the Plaintiff obtained over a period of time between 1987 and 1995. *Id.* According to the Defendant, as of April 16, 2013, the total amount owed by the Plaintiff to the Defendant under the FFELP Loan is $135,115.92, with interest accruing at the rate of $18.97 per diem. *Id.* at ¶ 9. Since the FFELP Loan's issuance, the Plaintiff has made $452.55 in payments. *Id.* at ¶ 10.

The FFELP Loan is eligible for both consolidation and income based repayment ("IBR") as part of the William D. Ford Direct Loan Program (the "Ford Program").[3] *Id.* at ¶ 12. In addition, the Plaintiff is eligible for IBR in the FFELP program with his lender. *Id.* Under the IBR option, the repayment period is a maximum of 25 years. *Id.* at ¶ 13. Monthly payments are equal to 15% of the difference between the Plaintiff's Adjusted Gross Income ("AGI") and 150% of the United States Department of Health & Human Services Poverty Guidelines, divided by twelve. *Id.* The payments under an IBR plan are recalculated annually based upon the Plaintiffs previous year's AGI. *Id.* at ¶ 14. According to the Plaintiff's 2012 tax return, which the Plaintiff and his wife filed jointly, the Plaintiff had an AGI in 2012 of $41,630.00 and a family size of three. *Id.* Based upon the Plaintiff's 2012 tax return, the Plaintiff's estimated monthly student loan payment under an IBR plan would be $154.19, as calculated by the following formula: (($41,630.00 − $29,295.00) × 0.15)/12. *Id.* Under the IBR option, at the end of the 25 year period, any balance that remains would be cancelled by the Secretary of Education. *Id.* at ¶ 15. Although he was apprised of his eligibility for both the Ford Program and the IBR option, the Plaintiff has not sought to consolidate or to repay his debt under an IBR plan. *Id.* at ¶ 17.[4]

---

2. The Defendant is the current holder of the consolidated FFELP Loan that was made to the Plaintiff under a Federal Consolidation Loan Application and Promissory Note dated August 2, 2002. J. Stip. at ¶ 8.

3. Information on the programs can be found at 34 C.F.R. Part 685 *et seq., Id.*

4. In addition to being eligible for IBR, the Plaintiff is also eligible for several fixed amortized payment options, which would provide for full repayment of the Plaintiffs debt. J. Stip. at ¶ 16. Based upon the alleged $135,115.92 balance owed as of April 16, 2013, the estimated amount of the Plaintiffs monthly payments under these options, assuming an interest rate of 5.25%, would be as follows: (a) Under the standard plan, $746.12 per month for 360 months; or (b) Under the graduated plan, $591.13 per month for first two years, with an increase in the monthly

## II. Findings of Fact Based on Evidence Presented at Trial

In addition to the facts set forth in the Joint Stipulation, the Court makes the following additional findings of fact based upon the evidence which was presented at trial. In 1990, the Plaintiff received a Bachelor of Science ("B.S.") degree in Zoology from the University of Florida. Def.'s Ex. B, Resp. to Interrog. 15. From October 1992 through May 1995, the Plaintiff attended the University of Liverpool, where he pursued a degree in veterinary medicine. *Id.* In May 1995, the Plaintiff withdrew from the University without receiving a degree. *Id.* From August 2002 through August 2009, the Plaintiff attended Florida Atlantic University ("FAIT") and successfully obtained a Doctor of Philosophy ("Ph.D.") degree in Integrative Biology. *Id.* While at FAU, the Plaintiff worked as a teaching assistant and taught lab courses for undergraduates. Def.'s Ex. B, Resp. to Interrog. 4. The Plaintiff earned $20,000.00 per year in his position at FAU. *Id.*

From December of 2009 through December of 2010, the Plaintiff held a post-doctoral training position at Florida International University ("FIU"), where he performed cancer research and managed graduate students. *Id.* The Plaintiffs salary in this position was $36,000.00 per year. Def.'s Ex. B, Resp. to Interrog. 4. The Plaintiff was ultimately terminated from FIU, but was never told the reason.

The Plaintiff remained unemployed until August 2012, when he obtained a position at the University of Miami as an adjunct instructor for a biology laboratory. *See* Def.'s Ex. B, Resp. to Interrog. 4. The Plaintiff earned $2,666.67 per semester in that position. *Id.* As of May 1, 2013, the Plaintiff was employed in an adjunct faculty position at the University of Miami. *See* Pl.'s Ex. 6. The Plaintiff's gross monthly salary in that position is $667.67, and his net monthly salary is $629.00. *Id.*

Recently, the Plaintiff was offered an adjunct faculty position at Palm Beach State College which would begin on August 25, 2013. *Id.* This position would pay Plaintiff a gross monthly salary of $1,051.50, or a net monthly salary of $992.11. *Id.* The Plaintiff testified at trial, however, that he did not know if the position will be available as it depends on whether enough students enroll in the course. As of the date of the trial, no students had signed up for the class.

The Plaintiffs wife is 44 years old and works full time as a programmer at the University of Miami. *Id.* The Plaintiff's wife's gross monthly salary is $3,253.05, and her net monthly salary, after various deductions, is $2,220.11. *Id.* Included within these automatic monthly deductions are deductions for family health insurance, disability, and dental insurance, as well as a voluntary 403(B) retirement contribution in the monthly amount of $162.65.

Currently, the Plaintiffs and his wife's combined gross monthly income is $3,919.72, and their combined net monthly income after taking into account automatic deductions is $2,849.16. If the Plaintiff obtains the position at Palm Beach State College starting in August 2013, then their combined gross monthly income will likely be $4,304.55, and their combined net monthly income will likely be $3,212.22.

According to their tax returns, Plaintiff and his wife had an AGI for the years 2009 through 2012, including tax refunds, as follows:

payment amount every two years for a period of 360 months. *Id.*

| Year | AGI | Refund |
|------|------|--------|
| 2012 | $41,630 | $1,376 |
| 2011 | $45,169 | $ 100 |
| 2010 | $56,023 | $ 896 |
| 2009 | $44,997 | $2,526 |

Def.'s Exs. E, F, G, H, and I.

The Plaintiff's monthly household expenses are as follows:

| | |
|------|------|
| Rent | $ 1,600.00 |
| Electricity | $ 200.00 |
| Water and Sewer | $ 80.00 |
| Telephone | $ 90.00 |
| Food | $ 350.00 |
| Clothing | $ 25.00 |
| Dry Cleaning | $ 20.00 |
| Medical and Dental | $ 250.00 |
| Transportation | $ 200.00 |
| Recreation | $ 20.00 |
| Day Care (pre-k) | $ 450.00 |
| **Total:** | **$ 3,285.00** |

Pl.'s Ex. 6. With respect to efforts to minimize his expenses, the Plaintiff testified that he and his wife have made many sacrifices, including eliminating their gym memberships. Moreover, the Plaintiff and his wife drive older model cars—his car is twelve years old and his wife's car is six years old. The Plaintiff and his wife do not take vacations, and their monthly recreation expenditure is to take their son to Chuck E. Cheese. From the testimony, it is unclear as to whether the Plaintiff could obtain less expensive housing at the end of their current lease period.

The Plaintiff testified that in addition to the FFELP Loan, he also has another student loan which is not the subject of this adversary proceeding. The Plaintiff acknowledged that he is making payments on that student loan, but the amount of those payments is unclear.

Additionally, the Plaintiff is aware of the Ford Program and of the availability of IBR option as a means of repaying his student loan debt. Nevertheless, he admitted that he has not sought to repay his student loan debt under the IBR option and has no intention to do so because he believes he will face a tax liability for debt forgiveness at the end of the 25 year applicable period. He testified that such a tax burden at the age of 71 would be onerous.

With respect to the Plaintiff's efforts to improve his job situation, the Plaintiff testified that he has had difficulty obtaining employment in his chosen field of science

and academia. According to the Plaintiff, it is difficult to obtain employment in the scientific field unless you have recently published authoritative work. The Plaintiff has not had any recent publications. Moreover, his former professor failed to publish the Plaintiffs work as the Plaintiff expected. Instead, some of the Plaintiff's research was published, but credited to others.

Relevantly, the Plaintiff is the primary caregiver for his 4–and–a–half–year–old son because his wife works full time from 8:00 a.m. until 6:30 p.m. Their son presently attends private pre-kindergarten classes at the Bambini Academy for which the Plaintiff and his wife pay $450.00 per month. See Pl.'s Ex. 6. The Plaintiffs son attends a morning session from 8:30 a.m. until 1 p.m. Thus, the Plaintiff testified that he can only work during the morning hours or after his wife returns from work.

The Plaintiff testified that he applied for positions at the University of Miami and FIU, and as noted above, Palm Beach State College. He also applied to several other companies such as Scripps and Bayer Health Care. In addition, he is enrolled in programs with several employment agencies and placement services.

The Plaintiff also testified that he has made efforts to locate a position outside the scientific field, namely, as a police dispatcher. The Plaintiff testified that he completed certain paperwork that was sent to him, but he was unable to secure the position. He suggested that he is overqualified for many positions and thus is limited in his ability to find a job.

Additionally, the Plaintiff indicated that he has sleep apnea, Attention Deficit Disorder, depression, and anxiety. Def.'s Ex. B., Resp. to Interrog. 9. Nevertheless,

there was no evidence presented to show that any of those conditions precluded him from working, either in his chosen field or other fields.[5] While such conditions may have an effect on his ability to work diligently, the testimony did not suggest that the Plaintiff was totally disabled such that he is precluded from holding a job.

## CONCLUSIONS OF LAW

### I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. § 157.

### II. The Plaintiff Has Not Met His Burden Under the *Brunner* Test and, as such, the Debt Owed to the Defendant Constitutes a Nondischargeable Student Loan Debt

■ The U.S. Bankruptcy Code states that a discharge under section 727 does not discharge an individual debtor from any debt:

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)

(i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) or the Internal

---

5. The Plaintiff did not submit expert testimony or elaborate on the effect of such diseases on his ability to work. Further, he indicated that he is being treated for his conditions.

Revenue Code of 1986, incurred by a debtor who is an individual

11 U.S.C. § 523(a), Thus, under § 523(a)(8), the Court may discharge student loan debt only upon a showing of undue hardship by the debtor. Because Congress failed to define what constitutes an "undue hardship," many federal courts have adopted the three-prong test set forth in *Brunner v. New York State Higher Education Services.* 831 F.2d 395 (2d Cir.1987). The three-prong *Brunner* test requires that the debtor show:

(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Hemar Ins. Corp. v. Cox (In re Cox),* 338 F.3d 1238, 1241 (11th Cir.2003) (*quoting Brunner,* 831 F.2d at 396).[6] The Eleventh Circuit adopted the test reasoning that "the *Brunner* test leaves an avenue of relief and is an effective tool for identifying those debtors whose earning potential and circumstances make it unlikely that they will produce the means necessary to repay the student loans while maintaining a minimal standard of living." *Id.*

▮▮▮ The burden of proving each of the *Brunner* elements is on the debtor.

*Educ. Credit Mgmt. Corp. v. Stanley,* 300 B.R. 813, 817 (N.D.Fla.2003) (*citing Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful),* 267 F.3d 324, 326 (3rd Cir.2001) ("The debtor has the burden of establishing each element of [the *Brunner*] test by a preponderance of the evidence.")). Further, the *Brunner* test is, in general, a difficult standard to meet. *See id.* ("Congress's intent to make it harder for a student to shift his debt responsibility onto the taxpayer is clear from the 1998 amendments"). All three prongs of the *Brunner* test must be satisfied before a discharge based on undue hardship can be granted. Therefore, if any one of the three requirements is not met, the student loan debt cannot be discharged. *The Cadle Co. v. Webb (In re Webb),* 132 B.R. 199, 202 (Bankr.M.D.Fla.1991); *Russotto v. Educ. Credit Mgmt. Corp. (In re Russotto),* 370 B.R. 853, 856 (Bankr. S.D.Fla.2007). Based upon the evidence presented at trial, the Plaintiff did not meet his burden of establishing any of the three required elements of the *Brunner* test.

### A. The Plaintiff Can Maintain a Minimal Standard of Living if Forced to Repay the Student Loan Owed to the Defendant

▮▮▮ The first prong of the *Brunner* test requires that the debtor show he cannot maintain, based on current income and expenses, a "minimal standard of living" for himself and his dependents if forced to repay the loans. As stated by the United

---

6. As the Eleventh Circuit reasoned:
'The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.'
*In re Cox,* 338 F.3d at 1242 (*quoting In re Roberson,* 999 F.2d 1132, 1137 (7th Cir. 1993)).

States District Court for the Northern District of Florida:

> Under *Brunner*, the debtor is entitled to a "minimal standard of living" for herself and her dependents, but the debtor is not entitled to maintain whatever standard of living she has previously attained, nor the level she would maintain if required to repay the debt. "Minimal" does not mean preexisting, and it does not mean comfortable.

*Stanley*, 300 B.R. at 817–18. In essence, "[a] debtor cannot succeed under this prong by demonstrating that the repayment of the student loans would [merely] require him to make some major personal and financial sacrifices and live within a restricted budget." *In re Kehler*, 326 B.R. 142, 147 (Bankr.N.D.Ind.2005). This is because "the first prong of the *Brunner* analysis requires more than a showing of tight finances." *Pa. Higher Educ. Assistance Agency v. Faish*, 72 F.3d 298, 306 (3d Cir.1995), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996). Additionally, the "Plaintiff must demonstrate that [ ]he has maximized [his] ability to produce adequate income to pay [his] expenses and [his] student loans." *In re Brosnan*, 323 B.R. 533, 538 (Bankr. M.D.Fla.2005) (*citing Perkins v. PHEAA*, 318 B.R. 300, 305 (Bankr.M.D.N.C.2004) (citations omitted)).

██ The evidence presented at trial shows that the Plaintiff and his family can maintain a minimal standard of living if the Debtor's student loan is not discharged because of the variety of repayment options available. To begin with, in "the vast majority of the reported opinions in which the dischargeability of a student loan debt owed by a married debtor was at issue, the courts have considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of plaintiffs lifestyle." *In re White*, 243 B.R. 498, 509 (Bankr.N.D.Ala.1999) (numerous citations omitted), *reh'g denied*, 243 B.R. 515 (Bankr.N.D.Ala.1999). *See also, In re Greco*, 251 B.R. 670, 679 (Bankr.E.D.Pa. 2000) (stating that assistance to the debtor from any source must be weighed as a factor in determining the debtor's overall financial picture).[7] The Court agrees that

---

7. Nevertheless, "[s]ome courts have suggested, in a context where debtor and spouse each have income, that consideration of the entirety of the non-debtor spouse's income in the measure of the first *Brunner* prong is inappropriate." *In re Murphy*, 305 B.R. 780, 795 n. 18 (Bankr.E.D.Va.2004) (*citing Innes v. Kansas (In re Innes)*, 284 B.R. 496, 508 (D.Kan.2002) (bankruptcy court correctly considered all of non-debtor spouse's income and applied the proportionate share of her income to the family's essential living expenses for "[t]o require her to do more would essentially force [the non-debtor spouse] or her children to pay debts for which she is not liable and support [the debtor] while being denied the right to apply some of her income to reasonably non-luxury items.")) However, here, it is clear that the Plaintiff and his wife have made choices and sacrifices to care for their son. The Plaintiff contributes substantially to the family by serving as his child's primary caretaker. As such, his wife's income should be considered when determining their expenses, contributions, and quality of life. *See In re Murphy*, 305 B.R. at 795 n. 18 (court properly took into account debtor's non-debtor spouse's income when considering the first prong of the Brunner test "it appears fundamentally unfair to theoretically assume [the debtor] has no income yet has the substantial monthly living expenses scheduled by her"). Moreover, the Plaintiff did not provide evidence to suggest that his family was not functioning as a combined economic unit. *See id.* ("If a debtor is able to forgo outside employment and income and devote his or her full energies to child rearing, not to consider her spouse's income in calculation of whether the student loans may be repaid while maintaining a minimal lifestyle appears to be as artificial and inappropriate as assuming a family does not function as a combined economic unit."). Although the Court notes that the Plaintiff has not devoted all of his time to caring for his son, his testimony made

the earnings of the household must be taken into account when evaluating the Plaintiff's ability to maintain a minimal standard of living.

 When analyzing a debtor's household income, the federal poverty guidelines are worth noting. The guidelines provide a starting point by which to measure a debtor's financial situation, particularly when the debtor earns several times the poverty level. *See Stanley*, 300 B.R. at 818 (court noted that debtor's income was four times the poverty level for a family size of one); *Hart v. ECMC (In re Hart)*, 438 B.R. 406, 412 (E.D.Mich.2010) (*citing Elmore v. Mass. Higher Educ. Assistance Corp. (In re Elmore)*, 230 B.R. 22, 28 (Bankr.D.Conn.1999) ("Although the minimal standard of living test does not require a debtor to live below poverty level, the analysis 'begins, and ends' with a debtor's income when it is between two and three times the poverty level.")). Here, the Plaintiff's combined household income is $41,630.00. According to the Department of Health and Human Services, the federal poverty level for a family of three in the 48 contiguous states is $19,530. Thus, the Plaintiff's household AGI in 2012 was 2.13 times the federal poverty level.

Although some courts have chosen to conclude the analysis at this point, given the large debt at issue and the minimal income attributed to the Plaintiff, the Court will review the Plaintiff's options.

It is undisputed that the Plaintiff's FFELP Loan is eligible for consolidation or IBR. *See* J. Stip. at ¶ 12. As noted above, under the IBR option, the repayment period is a maximum of 25 years, after which any remaining balance is cancelled by the Secretary of Education.[8] The monthly payments each year are recalculated based upon the debtor's AGI from the previous year. In addition, under both the FFELP and the Ford Program, there is a limitation on the amount of interest that accrues and is capitalized while the student loan is being repaid under the IBR option. *See* 34 C.F.R. § 682.215(b)(4) and (5), and 34 C.F.R. § 685.221(b)(3) and (4). Based upon the Plaintiff's and his wife's 2012 jointly filed tax return, the Plaintiff's estimated IBR payment would be $154.19 per month.[9]

The Plaintiffs wife is currently contributing $162.50 per month to a voluntary 403(B) retirement plan. *See* PL's Ex. 6.

---

clear that he has made sacrifices in terms of scheduling work to be with his son. *See In re Davis*, 373 B.R. 241, 248 (W.D.N.Y.2007) (citation omitted) (*"Brunner* does not specifically require that total household income be utilized in considering this element, rather it simply states that the standard of living should be evaluated 'based on current income and expenses.' However, well established case law makes it clear that total household income, including that of a non-debtor spouse, live-in companion, life partner and contributing co-habitant, must be considered in conducting this minimal standard of living analysis, as well as its relevance in generally determining undue hardship under the Bankruptcy Code."). *See also In re White*, 243 B.R. at 507–512 (court found "as a matter of law that [the non-debtor's spouse's] income should be considered in deciding whether

[debtor] is able to pay his student loans and maintain a minimal lifestyle").

8. As described above, the monthly payments are equal to 15% of the difference between the Plaintiffs AGI and 150% of the HHS Poverty Guidelines, which are published by the U.S. Department of Health & Human Services, divided by twelve.

9. The Court notes that if Plaintiff was to file his own separate tax return, *i.e.* married but filing separately, the Plaintiffs estimated IBR payment would be zero based upon Plaintiff's individual income in 2012. *See* BCMC Ex. D. Under this scenario, the Plaintiff would still be considered current on his student loan. *See* 34 C.F.R. § 685.221(a), and 34 C.F.R. § 682.215(a).

The elimination of this one monthly expense alone will permit the Plaintiff to pay for his monthly payment under the IBR option and still maintain the exact same standard of living that he and his family are now maintaining. Other courts addressing voluntary contributions to retirement plans have also concluded that such expenditures are not necessary to maintain a minimal standard of living. *See, e.g., In re Speer,* 272 B.R. 186 (Bankr.W.D.Tex. 2001) (retirement contributions are considered an unnecessary expense for undue hardship purposes); *Pobiner v. Educational Credit Mgmt. Corp. (In re Pobiner),* 309 B.R. 405, 417 (Bankr.E.D.N.Y. 2009) (court concluded that plaintiff had not met first prong where his family expenses included items that were not necessary to a minimal standard of living, including his wife's 401(k) contributions). *Cf. In re Hester,* 330 B.R. 809, 813 (Bankr. S.D.Fla.2005) (citation omitted) (when addressing claim of substantial abuse under 11 U.S.C. § 707, court held that contributions to a retirement account are not " 'reasonably necessary to be expended for the maintenance or support of the debtor' "); *In re Parada,* 391 B.R. 492 (Bankr. S.D.Fla.2008) (same).

 In addition, a debtor's tax refunds must also be taken into account when determining the amount of income available to repay a student loan. *See, e.g., Sturtevant v. Educ. Credit Mgmt. Corp. (In re Sturtevant),* Adv. No. 6:09–ap–00909–ABB, 2011 WL 1656111, at *3 (Bankr.M.D.Fla. Apr. 26, 2011) (debtor's family had $646.40 per month surplus when accounting for pro rata tax refunds); *McNemar v. Student Loan Servicing Center (In re McNemar),* 352 B.R. 621 (Bankr.N.D.W.Va.2006) (court factored into income available for payment of student loans anticipated tax refunds); *Gharavi v. U.S. Dept. Educ. (In re Gharavi),* 335 B.R. 492 (Bankr.D.Mass. 2006) (in figuring amount of monthly income debtor had available, court took the average of the debtor's tax refunds over three years and then spread that amount out over twelve months). Here, the Plaintiff and his wife received federal tax refunds over the past four years ranging in amounts from $100.00 to $2,526.00, or an average of $1,224.50 per year.[10] Over a twelve month period, the Plaintiffs average annual refund provides an additional $102.00 per month of income that could be made available for student loan payments.

The final consideration is the Plaintiffs efforts to maximize his income. The Plaintiff testified that he applied for various jobs in his area of expertise, to which he has received no response or was otherwise denied. Nevertheless, in order to maximize income, a debtor must demonstrate that he is unemployable in other fields. *See In re Brosnan,* 323 B.R. at 538 (stating that "because Plaintiff did not demonstrate that she was unable to secure employment in other fields, the Court finds that Plaintiff has not maximized her income"). The Debtor testified that he was denied employment outside his area of expertise, specifically as a police dispatcher, but he failed to cite additional instances of efforts to seek a position outside of the scientific field. Moreover, he did not cite reasons, other than over-qualification, as to why he cannot be employed in other areas.

Because the Court concludes that the Plaintiff can maintain a minimal standard of living and still make the estimated IBR payment, the Plaintiff has failed to establish the first prong of the *Brunner* test. The Court's conclusion is in accord with the decisions of other courts in the Elev-

---

**10.** The average is even higher if only the refunds received in 2011 ($896.00) and 2012 ($2,526.00) are used: average of $1,711 per year or $142.58 per month.

enth Circuit when faced with similar situations. *See, e.g., Stanley*, 300 B.R. at 813–819 (debtor did not meet the first prong of *Brunner* test where she could afford to make payments and still maintain a minimal standard of living); *In re Sturtevant*, 2011 WL 1656111, at *3 (court held that plaintiff did not prove the first prong where she could repay her student loan under the IBR payment and maintain a minimal standard of living); *In re Russotto*, 370 B.R. at 858 (same); *Educ. Credit Mgmt. Corp. v. Boykin (In re Boykin)*, 313 B.R. 516 (M.D.Ga.2004) (same).

### B. There Are No Additional Circumstances Within the Purview of the *Brunner* Test Indicating that the Plaintiff's State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period

In evaluating the second prong of the *Brunner* test, the Court considers any "additional circumstances" which might prevent the Plaintiff from "maintaining a minimal standard of living for a significant portion of the repayment period if [ ]he is required to repay the student loans." *In re Brosnan*, 323 B.R. at 538.[11] "The second prong is the heart of the *Brunner* test, and is often difficult to prove because it requires the debtor to show that she will be unable to pay her student loan debt in the future for reasons outside her control." *Matthews–Hamad v. Educ. Credit Mgmt. Corp. (In re Matthews–Hamad)*, 377 B.R. 415, 421–22 (Bankr.M.D.Fla.2007) (*citing In re Johnson*, 299 B.R. 676, 680 (Bankr.M.D.Ga.

2003)). Addressing the second prong of *Brunner*, several Circuit Courts, including the Eleventh Circuit, require that a debtor show a "certainty of hopelessness" in order to meet his or her burden of proof:

> Under *Brunner*, undue hardship does not exist simply because the debtor presently is unable to repay his or her student loans; the inability to pay must be "likely to continue for a significant time," . . . such that there is a "certainty of hopelessness," that the debtor will be unable to repay the loans within the repayment period.

*In re Mosley*, 494 F.3d 1320, 1326 (11th Cir.2007) (*quoting In re Cox*, 338 F.3d at 1242; *In re Brightful*, 267 F.3d at 328). *See also In re Frushour*, 433 F.3d 393, 401 (4th Cir.2005); *In re Tirch*, 409 F.3d 677, 681 (6th Cir.2005). This factor "most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy." *In re Spence*, 541 F.3d 538, 544 (4th Cir.2008) (*quoting In re Frushour*, 433 F.3d at 401). Moreover, "[a]dditional circumstances 'must be beyond the debtor's control, not borne of free choice.'" *Jones v. Bank One Texas, et al.*, 376 B.R. 130, 140 (W.D.Tex. 2007) (quotation omitted).

"The Eleventh Circuit has not provided clear guidance on applying prong two other than to embrace the 'certainty of hopelessness' standard." *In re Williams*, 492 B.R. 79, 87 (Bankr.M.D.Ga.2013) (*citing Mosley*, 494 F.3d at 1326). Nonethe-

---

11. The second prong of *Brunner* is focused on the long-term outlook of a debtor's particular situation, and in particular, whether the circumstances are such that they will last for a significant portion of the repayment period. Here, in light of the availability of IBR as a means of repaying the FFELP Loan, that period is 25 years. The Court has already concluded that Plaintiff can maintain a minimal

standard of living and remain current on his student loan payment under the IBR option. For that reason, even if the present circumstances were to continue for a significant portion of the repayment period, barring additional factors, the Plaintiff could still repay his student loan. Thus, for that reason, the second prong has not been met. *See In re Russotto*, 370 B.R. at 858.

less, it is apparent that "[t]his prong recognizes the potential continuing benefit of an education, and requires that the debtor show her grim financial condition is likely to exist for a substantial portion of the repayment period." *In re Matthews–Hamad,* 377 B.R. at 422 (*citing In re Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993)). Here, the Plaintiffs situation does not appear hopeless. The Plaintiff is a forty-six-year-old, relatively healthy, and well-educated man. He holds several degrees, including a B.S. degree in Zoology from the University of Florida, and a Ph.D degree in Integrative Biology from Florida Atlantic University.[12] Although the Court is sympathetic to the Plaintiffs health issues—namely Attention Deficit Disorder, sleep apnea, anxiety, and depression, the Plaintiff failed to show how his medical conditions prevent him from working permanently.[13] Moreover, the Plaintiffs wife and son are also healthy, and the evidence presented at trial establishes that the Plaintiff's wife is able to, and is in fact, working full time.

The Plaintiff presented some evidence of limitations on his ability to work during the afternoon because he is the primary caregiver for his son. However, the Plaintiff testified that he will be starting a new part-time position in August 2013 at Palm Beach State College, provided that enough students enroll in the course. This position would pay him more than he was making at the time of trial. While the Plaintiff testified that the position at Palm Beach State College will only come to fruition if enough students enroll, the Plaintiff's ability to obtain new employment demonstrates that his situation is not "hopeless" because of the fact that a college is willing to offer employment. Although the Court recognizes the difficul-

---

12. As noted by the Bankruptcy Court for the Middle District of Florida, "in evaluating whether there is a certainty of hopelessness or merely a temporary dire financial condition, the Court must keep in mind the important policy reasons for ensuring the success of government-sponsored student loan programs." *In re Matthews–Hamad,* 377 B.R. at 422. "Recognizing the value of education in the pursuit of equal opportunities, 'Congress made student loans available to those who otherwise may not have been able to receive adequate financing of a college education from private lenders.'" *Id.* (*quoting In re Roberson,* 999 F.2d at 1135).

13. "Only a debtor with rare circumstances will satisfy this prong of *Brunner.*" *In re Matthews–Hamad,* 377 B.R. at 422 (*citing Frushour,* 433 F.3d at 401). "A debtor might satisfy this prong if [ ]he can establish that [ ]he is ill, disabled, lacking usable job skills, or responsible for a large number of dependents." *Id.* (*citing Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler),* 397 F.3d 382, 386 (6th Cir.2005)). Here, "[i]n order to prove the extraordinary circumstances necessary to meet prong two of the *Brunner* test, Plaintiff must present evidence which corroborates h[is] own testimony regarding h[is] medical difficulties." *In re Brosnan,* 323 B.R. 533, 538 (Bankr.M.D.Fla.2005) (*citing Folsom,* 315 B.R. at 165 (citations omitted)). "Although evidence need not consist of extensive expert testimony, it must corroborate the allegations testified to by the debtor. The Court has previously found that a debtor's testimony alone cannot establish prong two of the *Brunner* test if the debtor's health is at issue." *Id.* The Plaintiff provided testimony and responded to the Defendant's interrogatory asserting his disabilities. Def.'s Ex. B, Resp. to Interrog. 9. *See Swinney v. Academic Fin. Servs. (In re Swinney),* 266 B.R. 800, 805 (Bankr. N.D.Ohio 2001) ("Although such [corroborating] evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. . . . For example, if properly authenticated, letters from a treating physician could be utilized."). Here, the crucial requirement is that the Plaintiff must show that his medical conditions prevent him from working, which he failed to do.

ties inherent in finding a position in academia, the Plaintiff is not precluded from finding a position in another field.[14]

In addition, the Plaintiff's financial situation will likely improve in the near future when the Plaintiffs son begins school.[15] *See Educ. Credit Mgmt. Corp. v. Beattie,* 490 B.R. 581, 589–90 (W.D.Wash.2012) (court could take judicial notice of the fact that in the United States, children are afforded free public education from the ages of approximately five to eighteen). Once the Plaintiff's son begins school, the Plaintiffs monthly day care expense of $450.00 per month will be eliminated or reduced, depending on the necessity of pre-and post-school care. *See id.*; *In re Pobiner,* 309 B.R. at 418 (debtor's monthly day care expenses will cease when the debtor's child begins kindergarten).

Therefore, the Plaintiff has not sustained his burden of establishing any exceptional circumstances showing a certainty of hopelessness. While the Court is sympathetic to the difficulties of the Plaintiffs present circumstances and the condition of the job market, there are no "additional circumstances," outside of the normal hardships faced by bankruptcy petitioners, which would render his situation hopeless.

### C. The Plaintiff Has Not Made a Good Faith Effort to Repay the Loan Owed to the Defendant for Purposes of the *Brunner* Test

Finally, the evidence presented at trial shows that the Plaintiff has not made a good faith effort to repay the FFELP Loan owed to the Defendant.

The cases make clear that good faith in repayment does not simply mean that a debtor has made payments on his student loans. Rather, the courts interpreting good faith note that a debtor must also put on evidence to prove that the debtor has made sufficient efforts to obtain employment, maximize income, and minimize expenses. *See, e.g., In re Mosley,* 494 F.3d at 1327; *In re Spence,* 541 F.3d 538, 544 (4th Cir.2008); *In re Goulet,* 284 F.3d 773, 779 (7th Cir.2002); *In re Kidd,* 472 B.R. 857, 862 (Bankr.N.D.Ga.2012). Moreover, a debtor's efforts to take advantage of eligible repayment or restructuring options that make the debt less onerous, including those afforded by the Ford Program and IBR options, are a component of the good faith inquiry. *See, e.g., In re Mosley,* 494 F.3d at 1327, *In re Russotto,* 370 B.R. at 859; *In re Sturtevant,* 2011 WL 1656111, at *4; *In re Brosnan,* 323 B.R. 533, 538–39 (Bankr.M.D.Fla.2005); *In re Frushour,* 433 F.3d at 402; *In re Tirch,* 409 F.3d at 682–83; *In re Alderete,* 412 F.3d 1200, 1206 (10th Cir.2005); *In re Pobiner,* 309 B.R. at 421 ("Good faith is also measured by a debtor's effort, or lack thereof, to negotiate an alternative repayment plan.").

The Plaintiff presented only minimal evidence regarding his good faith. As for actual payments, the parties stipulated that between August 2, 2002, the date the FFELP Loan was issued, and April 25, 2013, the Plaintiff made payments totaling only $452.55. Nonetheless, the Plaintiff testified at trial that he has made payments on a different student loan that is

---

14. Although the Plaintiff gave an example of being "over-qualified" for the dispatcher position, the Plaintiff did not provide sufficient testimony suggesting that all fields are precluded because of his educational background. Thus, the Plaintiff is not without options because he is not permanently disabled or otherwise fully precluded from working.

15. There was no testimony presented to suggest that the Plaintiff's son would be unable to attend school.

not the subject of this adversary proceeding. Although the reason for this is unclear, it tends to show a lack of good faith on the Plaintiffs part.[16] ·

The Plaintiff also testified that he obtained deferments and forbearances on the FFELP Loan. Obtaining deferments, however, does not demonstrate good faith when a deferment is not followed by payment or significant efforts to work out a reasonable repayment schedule. *See Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 327 (4th Cir.2008) ("without reasonable efforts to make subsequent payments, requesting deferments and forbearances alone does not establish good faith"). The Plaintiff did not present evidence of any efforts to make payments after having received deferments, and as discussed further below, he rejected the available IBR option.

In addition, the evidence does not support a determination that the Plaintiff has made a good faith effort to maximize income and minimize expenses. The continued contribution by the Plaintiffs wife to a voluntary 403(B) plan is not indicative of sufficient efforts to minimize expenses for purposes of the *Brunner* test. *See, e.g., Shirzadi v. U.S.A. Grp. Loan Servs. (In re Shirzadi)*, 269 B.R. 664 (Bankr.S.D.Ind. 2001) (the court held that 44 year old debtor did not prove good faith effort to minimize her expenses where she contributed a biweekly total of $200.00 to a retirement account and education fund for her children); *Educ. Credit Mgmt. Corp. v. Young*, 376 B.R. 795, 800 (E.D.Tex.2007) (debtor failed to prove the third prong where she made monthly 401(k) contribution of $220.00); *In re Pobiner*, 309 B.R. at 420–21 (debtor failed to prove the third

prong where, *inter alia*, debtor continued to make contributions to 401(k) plan). Further, even though the Plaintiff received a number of federal tax refunds over the years, there was no evidence presented to show that any of those refunds were used toward payment of the student loan debt owed to the Defendant. *See Wolph v. U.S. Dep't of Educ. (In re Wolph)*, 479 B.R. 725, 731 (Bankr.N.D.Ohio 2012) (court concluded that debtor did not show good faith effort to repay where she "did not utilize any of [her tax refunds] toward repayment of her student loan obligations.").

As noted above, the Plaintiff did present some evidence of recent efforts to obtain employment positions in the scientific field. However, the only concrete example given of any effort to locate employment outside his chosen field was his submission of an application for a police dispatcher position. *See In re Brosnan*, 323 B.R. at 537 (court held that debtor, a lawyer, did not maximize her income where she did not demonstrate that she was unable to secure employment in other fields). Further, while the Plaintiff testified that he is the primary caregiver for his son, there was no evidence presented as to why the Plaintiff could not otherwise work during the day when his son is in day care.

Finally, the Plaintiff's refusal to take advantage of the IBR option is further evidence of his lack of good faith. "A debtor's effort to seek out options to make the student loan debt less burdensome is an important component of the good-faith inquiry." *In re Matthews–Hamad*, 377 B.R. at 423 (*citing Frushour*, 433 F.3d at 402) (citation omitted). "Although not dispositive, it shows that the debtor takes her loan obligations seriously and is trying to

---

16. As noted by one court, paying "one of her educational debts, while seeking to discharge all of her remaining educational obligations, does not square with the good faith prong of

the *Brunner* test." *Wolph v. U.S. Dep't of Educ. (In re Wolph)*, 479 B.R. 725, 732 (Bankr.N.D.Ohio 2012).

repay them despite her unfortunate circumstances." *Id.* (*citing In re Tirch,* 409 F.3d at 682–83 (citation omitted)). Here, it is undisputed that the Plaintiff was made aware of the Ford Program and the availability of IBR. It is also undisputed that the Plaintiff refused to take advantage of the IBR option even though it would provide for a greatly reduced monthly student loan payment.[17]

Here, the Plaintiff failed to provide a legitimate basis for his refusal to take advantage of the Ford Program or the IBR option. At trial, the Plaintiff testified that his reason for rejecting IBR as an option was his belief that he would have a huge tax liability in 25 years for debt forgiveness income. The vast majority of courts that have addressed this issue have concluded that it is speculative, at best, to guess what the tax laws will be in 25 years. *See, e.g., ECMC v. Stanley,* 300 B.R. at 818 n. 8 ("Forecasting such a tax liability under whatever tax laws will be in effect in 25 years would be sheer speculation."); *In re Archibald,* 280 B.R. 222 (Bankr.S.D.Ind. 2002) (tax implications of debt forgiveness of debt are speculative at best); *Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane),* 287 B.R. 490, 500 n. 7 (9th Cir. BAP 2002) (same, citing *Archibald* and noting that while a tax burden was not unlikely, the availability of IBR should still be considered); *Burton v. Educ. Credit Mgmt. Corp. (In re Burton),* 339 B.R. 856, 889 (Bankr.E.D.Va.2006) (analysis of potential tax liability in 25 years would be

speculative); *Educ. Credit Mgmt. Corp. v. Rhodes,* 464 B.R. 918, 926 (W.D.Wash. 2012) (tax implications at end of IBR period are speculative).

Moreover, even under existing tax laws, a taxpayer only has tax liability for debt forgiveness if he is solvent,[18] in essence, if the amount of his assets exceed the amount of liabilities, including the debt that is being cancelled. *See* 26 U.S.C. § 108(a)(1)(B) and § 108(d)(3); *Educ. Credit Mgmt. Corp. v. Jesperson,* 571 F.3d 775, 782 (8th Cir.2009); *Educ. Credit Mgmt. Corp. v. Bronsdon,* 421 B.R. 27, 35 (D.Mass.2009). Here, the purported amount of the Plaintiff's student loan debt owed to the Defendant was $135,115.91 as of April 16, 2013, with interest continuing to accrue at the rate of $18.97 per diem. The amount of this student loan would be included in any calculation of the Plaintiff's solvency, and the Plaintiff did not put on any evidence to show that his assets, even at the time of trial, exceed his liabilities.[19] *See Rhodes,* 464 B.R. at 926 ("But [the Debtor] did not submit evidence that he would incur such tax liability, despite the fact that he bore the burden of doing so, and the Ninth Circuit Bankruptcy Appellate Panel has discouraged speculation over the tax implications of participation in income-based repayment plans.").

Therefore, the Court concludes that the Plaintiff did not prove that he has made a "good faith effort" to repay the student loan he owes to the Defendant, and, as

17. Furthermore, the required payment would be $0 per month if the Plaintiff files his tax return separately from his wife—provided that his income remains the same.

18. "For the 'purposes of [section 108], the term "insolvent" means the excess of liabilities over the fair market value of assets' at the time immediately before the discharge of the debt." *Educ. Credit Mgmt. Corp. v. Bronsdon,* 421 B.R. 27, 35 (D.Mass.2009) (*citing* 26

U.S.C. § 108(d)(3); *Merkel v. Comm'r of Internal Revenue,* 192 F.3d 844 n. 3 (9th Cir.1999) (applying definition)).

19. It is highly unlikely that Plaintiff is solvent today from a balance sheet perspective since the evidence at trial was that he and his wife do not own a home, but rather rent, and their two cars are 6 and 12–years–old.

such, did not meet the third prong of the *Brunner* test.

## III. *Conclusion*

For the reasons discussed above, the Court finds that the debt owed to the Defendant is nondischargeable pursuant to § 523(a)(8).

### *ORDER*

The Court, being fully advised in the premises, hereby **ORDERS AND AD-JUDGES** that:

1. The student loan debt owed by the Plaintiff to the Defendant for the FFELP Loan is **NONDIS-CHARGEABLE** pursuant to 11 U.S.C. § 523(a)(8).

2. The Court shall enter a Final Judgment contemporaneously herewith.

3. After entry of the Final Judgment, the Clerk is hereby directed to close the case.